UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| SHANE M. CARRIER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:08-CV-314 |
| ) | |
| CITY OF FORT WAYNE and ) | |
| FORT WAYNE POLICE DEPARTMENT, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

### I. INTRODUCTION

In this reverse discrimination case, Shane Carrier, a Caucasian male, is suing the City of Fort Wayne and the Fort Wayne Police Department (together referred to as "FWPD"). (Docket # 1.) He asserts that FWPD discriminated against him on the basis of his race, national origin, and gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, when it denied him the opportunity to compete for the position of police officer that was awarded to Raquel Foster, a Hispanic female.[1]

FWPD moves for summary judgment on all claims, arguing, among other things, that Carrier's claims are barred by the statute of limitations. (Docket # 16, 17.) Carrier filed a response to the motion on October 16, 2009 (Docket # 18), and FWPD timely filed its reply

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

(Docket # 21).[2] Because Carrier's claims are indeed time-barred, FWPD's motion for summary judgment will be GRANTED.

## II. FACTUAL AND PROCEDURAL BACKGROUND[3]

In his Complaint and EEOC charge, Carrier styles his case as one of reverse discrimination because he was denied the opportunity to compete for the FWPD police officer position awarded to Foster, essentially claiming that "the job opening was never posted pursuant to standard operating procedure." (Compl. ¶ 8, Ex. A.) Specifically, Carrier alleges that in 2006, at the same time FWPD hired Foster, he called FWPD on four separate occasions to inquire about open positions but was told that it was not accepting applications. (Compl. ¶¶ 3, 4.) While the parties' briefs contain a hodgepodge of facts and allegations concerning the events after Foster was hired, this information is largely irrelevant and distracts from the real claim articulated in Carrier's pleading–that he was denied the opportunity to apply and compete for the job awarded to Foster.

As background, FWPD hires the large majority of its police officers through what it refers to as a "basic recruit class process".[4] (York V.S. ¶ 7.) That is, when FWPD has the need for additional officers and its budget allows, it schedules a program for the testing and hiring of

---

[2] Together with its reply brief, FWPD filed a motion to strike a certain portion of Carrier's affidavit. (Docket # 22.) Because FWPD's summary judgment motion should be granted even when Carrier's affidavit is considered, the motion to strike will be DENIED AS MOOT.

[3] For summary judgment purposes, the facts are recited in the light most favorable to Carrier, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Insofar as Carrier does not controvert the facts asserted by FWPD in its statement of material facts, those facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

[4] FWPD occasionally hires outside the basic recruit class process by offering positions to "lateral hires", that is, candidates who have at least two years experience as active duty law enforcement officers. (York V.S. ¶ 8.) The lateral hires then complete a four-week training session at FWPD's training academy. (York V.S. ¶ 8.) The parties agree that Carrier did not have two years of experience when he sought employment with FWPD in 2006.

2

applicants and then announces publicly that it is accepting applications for entrance into the recruit class. (York V.S. ¶ 7.) Typically, it receives several hundred applications for between twenty to forty positions. (York V.S. ¶ 7.) FWPD's practice is to accept applications only when it has a recruit class scheduled. (York V.S. ¶ 7.) If applicants satisfy the preliminary screening process, FWPD then conducts a twenty-week training academy in Fort Wayne. (York V.S. ¶ 7.)

At some time prior to November 2005, Carrier, who was a state-certified reserve officer with several years of experience in that role with the Allen County Sheriff's Department, applied for and successfully completed the first six steps of the selection process for entrance into FWPD's 56th recruit class. (Carrier Aff. ¶¶ 4, 10.) Nonetheless, for reasons not explained in the record, he was ultimately not selected. (Carrier Aff. ¶ 4.)

In November 2005, Carrier contacted FWPD to inquire about the opening of the application process for the 57th recruit class. (Carrier Aff. ¶ 4.) FWPD responded that there were no classes planned at the time. (Carrier Aff. ¶ 4.) Carrier then moved to Los Angeles, California, and was accepted into, and graduated from, the Los Angeles Police Department ("LAPD") academy. (Carrier Aff. ¶¶ 10, 15.) He commenced his employment as a full-time law enforcement officer with the LAPD on March 6, 2006. (Carrier Aff. ¶ 15.)

In March 2006, FWPD Captain James Zamora introduced Raquel Foster, a Hispanic female, to FWPD Chief Russell York, a white male, after Foster told Zamora she was interested in becoming a police officer. (York V.S. ¶¶ 2, 4.) Zamora told Chief York that Foster was fluent in Spanish, was employed by the Metropolitan Human Relations Commission ("METRO") as an investigator, possessed a bachelor of arts degree, and was "really sharp". (York V.S. ¶ 4.) At the time York met with Foster, there was no basic recruit class planned, and it was uncertain there

3

would be one in the foreseeable future. (York V.S. ¶ 6.)

Nonetheless, during his meeting with Foster, Chief York urged Foster to submit an application. (York V.S. ¶ 11.) York's urging stemmed from Foster's fluency in Spanish coupled with "FWPD's dire need for Spanish-speaking officers";[5] in addition, Foster was highly recommended by Zamora, was a college graduate, had some investigating experience, and made a good personal impression. (York V.S. ¶¶ 10, 15.) York also told Foster that given the "immediate need of the FWPD for Spanish speaking officers" and since no FWPD recruit class was planned, he would send her to the Indiana Law Enforcement Academy ("ILEA") in Plainfield, Indiana, the facility used by most police departments in the State to train officer candidates. (York V.S. ¶¶ 9, 11.) He then directed the FWPD academy staff to preliminarily screen Foster with the intent of sending her to ILEA for training.[6] (York V.S. ¶ 12.)

On April 26, 2006, Foster filed her FWPD police officer application. (Defs.' Resp. to Req. for Produc. 379.) That same month, Carrier, now employed as a full-time LAPD police officer, telephoned FWPD to inquire if it was accepting applications for police officers; he believes he spoke with a secretary at FWPD's training academy. (Carrier Dep. 17-19.) Upon asking if FWPD was accepting applications for any positions, he was told: "Right now, no." (Carrier Dep. 19.) Carrier also monitored FWPD's web site during this time to see if any positions were posted, but none were listed. (Carrier Dep. 17.)

---

[5] Chief York states that in 2005 and 2006 FWPD had a "serious shortage of Spanish speaking officers." (York V.S. ¶ 5.)

[6] Since York became Chief in 2000, he has authorized sending only two other candidates to ILEA. (York V.S. ¶ 13.) The first was Juan Carlos Gutierrez, a Hispanic male who spoke fluent Spanish and held two bachelor's degrees. (York V.S. ¶ 13.) The second was Peter Mooney, a white male and former Irish national who had a bachelor's degree, was pursuing a master's degree, and was a high school teacher. (York V.S. ¶ 13.) Both candidates were personally recommended to Chief York by a senior officer. (York V.S. ¶ 13.)

In May 2006, Carrier again telephoned FWPD to inquire about open positions and this time spoke with Sergeant Matt Enyeart, who was associated with the FWPD training academy. (Carrier Dep. 20-21.) Enyeart informed him that FWPD was not accepting applications at that time, but suggested that there might be a basic recruit class in the near future. (Carrier Dep. 20-21.)

That same month, on May 5, 2006, Foster successfully completed the background check and voice stress test that were routinely administered to candidates during the preliminary screening process. (Hadley V.S. ¶ 8.) However, she failed the physical fitness test ("FIT test"), a document which Enyeart signed. (Defs.' Resp. to Req. for Produc. 382.) Nevertheless, just days later, on May 16, 2006, FWPD extended Foster a conditional offer of employment as a police officer. (Defs.' Answer to Interrog. No. 3.) Following the conditional offer, Foster successfully completed a psychological examination, a physical examination, Police Pension Board review, Public Employees Retirement Fund review, and an interview with the Board of Public Safety. (Hadley V.S. ¶ 8.) In addition, Foster re-attempted, and this time passed, the FIT test. (Hadley V.S. ¶ 8.) Chief York exempted Foster from taking a written examination and from participating in a staff interview, two requirements for basic recruit applicants. (York V.S. ¶ 17.)

In June or July of 2006, Carrier exchanged voicemail messages with Captain Dottie Davis, who had been one of Carrier's instructors when he participated in the academy as an Allen County Police Reserve officer. (Carrier Dep. 18.) She informed him by voicemail that FWPD was not accepting applications for basic police officer recruits and that he did not meet the criteria for a lateral hire because he did not have two years of experience as a full-time police officer. (Carrier Dep. 18.) Also in June or July, Carrier spoke with Captain Jeff Hadley, the

5

Director of Training at the academy. (Carrier Dep. 21-22.) Hadley told Carrier that FWPD was not accepting applications but probably would be doing so soon. (Carrier Dep. 21-22.) Hadley encouraged Carrier to eventually complete an application at the appropriate time. (Carrier Dep. 21-22.) He also suggested that FWPD might be able to do a "special circumstance lateral."[7] (Carrier Dep. 21-22.)

In September 2006, Foster was officially hired as a FWPD officer. (Defs.' Answer to Interrog. No. 3.) She attended training at ILEA and was sworn in as a FWPD officer in December 2006. (Defs.' Answer to Interrog. No. 3.)

In May 2007, Carrier learned for the first time that Foster was hired as a FWPD police officer in September 2006 and the circumstances under which she was hired. (Carrier Aff. ¶ 9.) Over four months later, on October 10, 2007, Carrier filed a Charge of Discrimination with METRO and the Equal Employment Opportunity Commission ("EEOC"), checking the boxes for race and sex discrimination. (Compl. ¶ 10, Ex. A.) After receiving a Dismissal and Notice of Rights from the EEOC (Compl. ¶ 11, Ex. B), Carrier filed the instant action in Allen Superior Court on November 26, 2008, alleging that he was discriminated against on the basis of his race, sex, and national origin when he was denied the opportunity to apply for the position awarded to Foster. (Docket # 1.) FWPD timely removed the action to this Court on December 31, 2008.

---

[7] Carrier never spoke with Chief York, the official who hired Foster, when he called FWPD to inquire about open positions. (York V.S. ¶ 19.) By the same token, Chief York was similarly unaware of Carrier's interest in joining FWPD. (York V.S. ¶ 19.)
  Ultimately, on August 2, 2006, FWPD announced that it was accepting applications for positions in its 57th recruit class, and Carrier submitted one on October 18, 2006. (Carrier Dep. 29.) He participated in the testing process, but ultimately was eliminated from the class when he failed the written examination. (Carrier Dep. 29, 31-32, Ex. B.) The uncontested fact that Carrier actually was allowed to compete on two separate occasions for a FWPD job but ultimately washed out of both recruit classes (once before Foster was hired and again after) raises serious questions about, among other things, the basis for any damages. Nevertheless, given the outcome of the present motion, the issue does not require further discussion.

6

(Docket # 2.)

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008) (quoting *Payne*, 337 F.3d at 770). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id*. at 771.

### IV. DISCUSSION

FWPD argues, among other things, that it is entitled to summary judgment because Carrier's claims are time-barred. Title VII provides that a charge of discrimination must be filed with the EEOC (or a local agency empowered to handle such charges) within 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1); *Lewis v. City of Chicago*, 528 F.3d 488, 490 (7th Cir. 2008). A timely-filed charge is a necessary predicate to

bringing a lawsuit under Title VII. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005). "[C]harges not filed within 300 days of the act in question are not actionable." *Id*.

As FWPD sees it, Carrier's EEOC charge filed on October 10, 2007, was untimely. It contends Carrier had only until May 28, 2007, to file the charge–that is, 300 days after July 31, 2006, the last date when, in Carrier's telling, FWPD denied him an application. (Mem. in Supp. of Mot. for Summ. J. 8.) Carrier, however, disagrees. He contends that the 300-day statute of limitations did not commence until May 2007, when he first learned of Foster's hiring circumstances and suspected he was a victim of reverse discrimination. (Pl.'s Br. in Opp'n 3-5.)

Carrier's interpretation is incorrect. "An employment discrimination cause of action accrues when an adverse employment action is taken and communicated to the plaintiff." *Hardin v. CNA Ins. Cos.*, 103 F. Supp. 2d 1091, 1097 (S.D. Ind. 1999) (citing *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)). That is, "[a] plaintiff's action accrues when he discovers that he has been injured *not* when he determines that the injury was unlawful." *Thelen*, 64 F.3d at 267 (emphasis added); *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001); *see Hardin*, 103 F. Supp. 2d at 1098 (concluding that the statute of limitations began to run when plaintiff was denied the opportunity to interview for a position, not when she later learned that less qualified white individuals filled the open positions); *Gastineau v. Austin, Nichols & Co.*, No. 97 C 0405, 1997 WL 208437, at *3 (N.D. Ill. Apr. 21, 1997) (concluding that the statute of limitations commenced on the date the defendant refused to hire plaintiff, not when he later discovered his potential cause of action); *Koski v. Gainer*, No. 92 C 3293, 1995 WL 599052, at *10 (N.D. Ill.

8

Oct. 5, 1995) (stating that plaintiff's injury occurred when he was not allowed to continue in the hiring process, not when he became aware of wrongdoing).

More specifically, "[t]he plaintiff's injury is tied necessarily to the adverse employment action. This remains true whether the adverse employment action is termination, a refusal to promote, or a refusal to hire." *Hardin*, 103 F. Supp. 2d at 1097 (collecting cases). Here, the sole "injury" that Carrier complains of in his Complaint and EEOC charge is FWPD's refusal to accept his application for the position that Foster ultimately was awarded in September 2006. Consequently, the statute of limitations here commenced at the latest on July 31, 2006, the last possible date that FWPD purportedly denied Carrier an application. Therefore, absent equitable tolling, the statute of limitations expired on May 28, 2007, that is, 300 days from July 31, 2006.

Equitable tolling, however, permits "a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada*, 920 F.2d at 451. These principles require a court "to consider whether a reasonable person in the plaintiff's position would have been aware of the *possibility* that he had suffered an adverse employment action because of illegal discrimination." *Beamon*, 411 F.3d at 857 (emphasis in original). The court must focus on "whether and when a plaintiff had objective information suggesting that he was treated differently than someone in an unprotected class." *Jackson v. Rockford Hous. Auth.*, 213 F.3d 389, 396 (7th Cir. 2000).

Here, the parties do not dispute that Carrier first "awaken[ed] to the possibility of a Title VII claim" in May 2007, when he learned that Foster's application had been considered and

9

accepted during the same time frame in which his application was refused.[8] *Beamon*, 411 F.3d at 860. Indeed, prior to learning of Foster's hiring circumstances, Carrier seemingly would have had no reason to suspect reverse discrimination when FWPD stated that it had no open positions. Thus, Carrier is entitled to have the statute of limitations equitably tolled until he learned about Foster's hiring.

The question then boils down to whether Carrier's filing of his EEOC charge more than four months after he learned about Foster is timely with respect to equitable tolling principles. Equitable tolling does not bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term, but simply "gives the plaintiff extra time if he needs it." *Cada*, 920 F.2d at 451; *see also Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1212-13 (7th Cir. 1993). Thus, equitable tolling suspends the running of the statute of limitations only "for such time as was reasonably necessary to conduct the necessary inquiry." *Cada*, 920 F.2d at 451. That is, "a plaintiff who invokes equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information." *Id*. at 453; *see also Unterreiner*, 8 F.3d at 1212-13.

In that respect, the Seventh Circuit Court of Appeals has articulated on at least one

---

[8] FWPD does not suggest that Carrier, by exercising due diligence, could have learned of Foster's hire on November 20, 2006, when the article entitled "Recruit diversity" was published in *The Fort Wayne News-Sentinel*. The following is an excerpt from the article:

> Sometimes, Hadley said, York is open about going outside the formal hiring process when a very good candidate is available and courted by other agencies. He said one Hispanic woman is currently going through the hiring process at the Indiana Law Enforcement Academy in Plainfield because there wasn't a recruit class open when she wanted to join.

(Carrier Aff. Ex. B.)

occasion that a four-month delay in filing a complaint is unreasonable with respect to equitable tolling. *Elmore v. Henderson*, 227 F.3d 1009, 1013 (7th Cir. 2000) (concluding that equitable tolling did not apply where plaintiff delayed four months in filing suit and offered no excuse for the delay); *see also Thelen*, 64 F.3d at 268 (finding a ten-month delay unreasonable); *Cada*, 920 F.2d at 453 (finding an eight-month delay excessive). Likewise, other district courts have found a four-month delay to be excessive, particularly where the plaintiff offers no excuse for his tardiness. *See, e.g., Tate v. I.B.E.W. - - N.E.C.A. Technical Inst.*, No. 09 C 1592, 2009 WL 3839319, at *4 (N.D. Ill. Nov. 10, 2009) (concluding that a three-month delay was unreasonable); *Wiley v. Johnson*, 436 F. Supp. 2d 91, 97 (D.D. C. 2006) (finding a four-month delay unreasonable); *Simmons v. Allsteel, Inc.*, No. 95 C 3049, 1999 WL 1045214, at *13 (N.D. Ill. Nov. 12, 1999) (finding a four-month delay unreasonable); *Campau v. Orchard Hills Psychiatric Ctr.*, 946 F. Supp. 507, 513 n.9 (E.D. Mich. 1996) (considering a four-month delay unreasonable).

In fact, with respect to equitable tolling, the Seventh Circuit Court of Appeals has distinguished the filing of an EEOC charge from a judicial complaint by concluding that an administrative complaint warrants little delay. It emphasizes that "[t]here is no duty of precomplaint inquiry in EEOC proceedings as distinct from federal court actions." *Cada*, 920 F.2d at 453; *see also Lewis*, 528 F.3d at 493-94. "To impose such a requirement would frustrate a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." *Lewis*, 528 F.3d at 493-94 (citation and internal quotation marks omitted). In fact, "one purpose of filing an administrative complaint is to uncover [facts relevant to the case]." *Thelen*, 64 F.3d at 268 (alteration in original). "The EEOC is supposed to do the investigating." *Lewis*, 528 F.3d

11

at 494.

Accordingly, the Seventh Circuit has at least twice articulated that a plaintiff "could have prepared an adequate administrative complaint *within days*" of his discovery that he had been replaced by a person outside of his class. *Cada*, 920 F.2d at 452 (emphasis added); *see also Thelen*, 64 F.3d at 268 (stating that the plaintiff "could have filed his administrative complaint within days, and at most weeks" of learning that a younger individual was doing the work he had previously performed). Therefore, with respect to the filing of EEOC charges and equitable tolling, "'reasonable time' has been defined as days and, at most, weeks" in the Seventh Circuit. *Tate*, 2009 WL 3839319, at *3 (citing *Thelen*, 64 F.3d at 268); *see also Juniel v. Park Forest-Chicago Heights Sch. Dist. 163*, 161 F. Supp. 2d 910, 915 (N.D. Ill. 2001) (same).

Here, Carrier waited *more than four months* to file his EEOC charge after discovering the circumstances under which Foster was hired. And, he offers no excuses for the delay. This lengthy delay, devoid of any legitimate explanation or justification, is unacceptable under Seventh Circuit case law. The Seventh Circuit has instructed:

> Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose. The statute of limitations is short in . . . most employment cases because delay in the bringing of suit runs up the employer's potential liability: every day is one more day of backpay entitlements. We should not trivialize the statute of limitations by promiscuous application of tolling doctrines.

*Cada*, 920 F.2d at 452-453. Consequently, since equitable tolling cannot be employed to cover Carrier's four months of unexplained inactivity, FWPD's motion for summary judgment will be GRANTED on the basis that his claims are time-barred.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket # 16) is GRANTED, and its motion to strike (Docket # 22) is DENIED AS MOOT. The Clerk is DIRECTED to enter a judgment in favor of Defendants and against Plaintiff. The final pretrial conference and jury trial are hereby vacated.

SO ORDERED.

Enter for December 8, 2009.

S/ Roger B. Cosbey  
Roger B. Cosbey  
United States Magistrate Judge